UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DOREEN HENDERSON, | ) | CASE NO. 1:16CV877 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Doreen Henderson ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In her brief on the merits, filed on August 5, 2016, Plaintiff asserts that the administrative law judge ("ALJ"): (1) improperly relied on the Medical-Vocational Guidelines to find that Plaintiff was not disabled without the testimony of a medical expert; and (2) issued a RFC finding that did not properly account for all of Plaintiff's limitations. ECF Dkt. #14 at 9-13. Defendant filed a response brief on October 5, 2016. ECF Dkt. #16. On October 12, 2016, Plaintiff filed a reply brief. ECF Dkt. #17.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I. PROCEDURAL HISTORY

On November 27, 2012, Plaintiff filed applications for DIB and SSI alleging disability beginning May 15, 2003. ECF Dkt. #12 ("Tr.") at 13.[2] Plaintiff's claims were denied initially

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system. When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages. Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than

and upon reconsideration.  *Id.*  Following the denial of her claims, Plaintiff requested a hearing, which was held on October 23, 2014.  *Id.* at 25.  In her pre-hearing brief and at the hearing, Plaintiff indicated that she was amending her alleged onset date to March 24, 2010.  *Id.* at 32, 264.  On November 21, 2014, the ALJ issued a decision denying Plaintiff's claims.  *Id* at 10.  Subsequently, the Appeals Council denied Plaintiff's request for review.  *Id.* at 1.  Accordingly, the November 21, 2014, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's November 21, 2014, decision on April 13, 2016.  ECF Dkt. #1.  On August 5, 2016, Plaintiff filed a brief on the merits.  ECF Dkt. #14.  Defendant filed a response brief on October 5, 2016.  ECF Dkt. #16.  On October 12, 2016, Plaintiff filed a reply brief.  ECF Dkt. #17.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

On March 24, 2010, Plaintiff sought treatment at Charak Center for Health and Wellness ("Charak").  Tr. at 421.  Treatment notes from this session describe Plaintiff's previous treatment and indicate that she had been receiving treatment from a different source for about three years for bipolar disorder, alcohol abuse, and attention deficit disorder, but did not keep her appointments.  *Id.* at 421, 428.  The treatment notes state that Plaintiff had been prescribed Seroquel for bipolar disorder and attention deficit disorder.  *Id.* at 421.  It was also noted that Plaintiff was not sure that she was bipolar, but needed the medication to sleep.  *Id.*  Further, the treatment notes state that Plaintiff was "caring for children" and was a "stand-up comic" at that time.  *Id.* at 428.  Plaintiff also expressed that she: was only nervous before "going on stage"; engaged in binge drinking; had a limited attention span; was unable to sleep without medication; wrote her own comedy material; exercised three times per week; and suffered from bipolar disorder and attention deficit disorder.  *Id.* at 421-28.  A global assessment of functioning ("GAF") score of sixty was assigned to Plaintiff.  *Id.* at 428.

the page number assigned when the Transcript was filed in the CM/ECF system.

In April 2010, Plaintiff reported: depression and lack of motivation; binge drinking one to two times per month; marijuana use twice per week; decreased impulse control; unusual thoughts relating to people talking about her; and loss of sexual desires. Tr. at 415. On examination, Plaintiff presented with a logical thought process, euthymic mood, full affect, average intelligence, normal memory, intact reasoning ability, good insight, good judgment, and normal impulse control. *Id.* at 419. Plaintiff was assigned a GAF score of sixty and prescribed medication for depression and insomnia. *Id.* at 420. In August 2010, Plaintiff indicated that she was having sleeping issues and was experiencing financial stress resulting from being laid off from her job. *Id.* at 411.

In March 2011, Plaintiff reported that she was upset about gaining weight, did not take one of her prescribed medications, had a conflict with her boyfriend, was experiencing financial stress, and that she wanted to obtain a GED. Tr. at 403. One month later, Plaintiff indicated that she wished to switch from Seroquil XR to regular Seroquil since she believed that the former had caused her to gain weight. *Id.* at 395. Plaintiff also stated that she had quit her job. *Id.* In April 2011, Plaintiff indicated that she was stressed by work, GED classes, and a lack of support from her husband, and that she was planning on applying for Social Security benefits. *Id.* at 391. "Marked" improvements in Plaintiff's mental status were noted in June 2011. *Id.* at 388. Also in June 2011, it was noted that Plaintiff: had a poor understanding of how to complete activities of daily living, and an inability to prioritize those activities; experienced anti-social thoughts and behavior that left her without support from family or friends; was abrasive, argumentative, defensive, and racially focused; and displayed daily chronic symptoms. *Id.* at 434. It was noted that Plaintiff was not capable of managing any benefits that may be due. *Id.* at 435.

On August 5, 2011, Plaintiff returned to Charak and it was noted that she was "benefitting greatly" from lithium and that her sleep had improved as a result of the Seroquel. Tr. at 551. Plaintiff indicated that she was "[g]etting some gigs here and there for her stand up comedy," looking for gainful employment, and wanted to finish her GED. *Id.* Improvements in Plaintiff's demeanor, affect, and disposition were noted. *Id.* On August 10, 2011, Plaintiff complained of poor concentration and no motivation. *Id.* at 526. Later in August 2011, Plaintiff

visited James Sunbury, Ph.D., for a consultative psychological examination. Tr. at 440. During the session, Plaintiff: informed Dr. Sunbury that she had bipolar disorder; indicated that she had last worked at an E-Check, but quit because she could not "live on $20.00 a day"; stated that she had gone to a comedy club a few months prior with a friend; and told Dr. Sunbury that she had quit drinking a "couple of months ago." *Id.* at 440-44. On examination, Dr. Sunbury noted that Plaintiff had: good concentration with relevant and appropriate responses; fair insight and judgment; significant limitations in responding appropriately to pressures in a work setting, but adding that he would need to review Plaintiff's psychiatric records to confirm such a belief; bipolar disorder with paranoid personality disorder; and a GAF score of sixty. *Id.* at 442-44.

In September 2011, Plaintiff reported that she was struggling to obtain enough exposure for her comedy shows, but nonetheless remained cautiously optimistic, albeit frustrated, about her future. Tr. at 546. Plaintiff indicated that she was taking some prerequisite courses in nursing at a local two-year school, but was unsure if she wanted to pursue nursing as a career. *Id.* Also in September 2011, Plaintiff reported increased anxiety and panic attacks, as well as depression and racing thoughts, and stated that she slept all day. *Id.* at 514, 522. Plaintiff reported paranoid thinking and auditory hallucinations in November 2011. *Id.* at 502. It was also noted that Plaintiff was non-compliant with her medication regimen. *Id.* Further, in late November 2011, Plaintiff indicated that she stopped taking her prescribed Lexipro and Abilify because the medications were "not working." *Id.* at 498. In December 2011, Plaintiff reported stress and that she was "drinking more," and it was noted that otherwise she appeared stable. *Id.* at 542. Plaintiff was counseled on the dangers of alcohol/marijuana use while on lithium, and she indicated that she skipped her lithium doses when consuming alcohol. *Id.* at 545.

In January 2012, Plaintiff was described as "baseline" and stated that she was happy with her medications. Tr. at 538. In May 2012, Plaintiff arrived "randomly" at the office of one of her doctors stating that she had stopped drinking and had been inconsistent with taking her medications. *Id.* at 534. Additionally, Plaintiff indicated that she was studying for her GED. *Id.* In July 2012, Plaintiff reported that she quit her job and that her depression was resolving, but her mood was worsening and she experienced paranoia. *Id.* at 530. On August 10, 2012,

Plaintiff indicated that a friend had passed away four days prior to the appointment, and that she had problems concentrating as she was preoccupied with thoughts of death. *Id.* at 526. Plaintiff also presented with poor concentration and no motivation. *Id.*

On September 10, 2012, Plaintiff indicated that she was experiencing mild improvement in her depression, but reported "very poor" sleep. *Id.* at 518. Two days later, Plaintiff reported to the emergency room at the Cleveland Clinic stating that she had been up for the previous three days and was "driving dangerously." *Id.* at 449. Plaintiff stated that her symptoms appeared suddenly and that she experienced auditory hallucinations. *Id.* The psychiatric department determined that Plaintiff was not experiencing a manic episode, and the only reason she was driving dangerously was because she was tired. *Id.* at 451. Plaintiff was told to discontinue the use of one of her medications and was instructed to follow up with the psychiatric department on an outpatient basis. *Id.* On September 18, 2012, Plaintiff reported depression, racing thoughts, and sleeping all day, but also indicated that she was looking for a job and trying to obtain a GED. *Id.* at 514. In November 2012, Plaintiff stated that her medications were working well and refused medication changes, resulting in a notation that she was non-compliant with her medical regimen since she refused the recommended change. *Id.* at 502. Plaintiff reported doing well on her medications and responding well to changes in her medications in December 2012. *Id.* at 490. Additionally, Plaintiff indicated that she was attempting to find work and was unable to travel to her job as a stand-up comic. *Id.* at 491.

In February 2013, Plaintiff reported increased stress and irritation due to "lack of help." Tr. at 480. Plaintiff indicated that her house was messy and disorganized, and that she was "going back to classes for [a] GED." *Id.* at 481. In April 2013, Plaintiff stated that she experienced severe anxiety when driving on the highway, but was "okay" when driving around town, and that the stressors in her life caused increased irritability. *Id.* at 573. The following month, Plaintiff stated that she was doing well, continued to attend GED classes, and was appearing in a play. *Id.* at 568.

On May 13, 2013, Todd Finnerty, Psy.D., reviewed Plaintiff's records and opined that she had moderate difficulties in activities of daily living, social functioning, and maintaining

concentration, persistence, or pace. *Id.* at 53. Dr. Finnerty also opined that there was insufficient evidence to establish repeated episodes of decompensation, each of extended duration. *Id.* Continuing, Dr. Finnerty stated that there was no significant limitation on Plaintiff's ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, or make simple work-related decision. *Id.* at 55. Dr. Finnerty also indicated that Plaintiff was moderately limited in her ability to: carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of or unreasonably lengthy rest periods. *Id.*

Plaintiff stated that she experienced depression and a sullen mood in August 2013 and September 2013. *Id.* at 555-56. In October 2013, Plaintiff moved to New York. Tr. at 630. On December 19, 2013, Plaintiff reported to the Montefiore Department of Psychiatry and Behavioral Sciences for an emergency evaluation. *Id.* at 591. Plaintiff indicated that her depression was worsening and, on examination, displayed a depressed mood and a somewhat constricted affect, but was nonetheless cooperative and had a grossly intact memory and fair judgment. *Id.* at 587. Continuing, Plaintiff reported auditory and visual hallucinations. *Id.* at 583. Plaintiff was referred for outpatient psychiatric care. *Id.* at 585. The following week, Plaintiff visited Galina Raykin, a licensed clinical social worker ("LCSW"), and reported a history of marijuana use and heavy drinking, but stated that she was only drinking three bottles of beer per week and that she did not consider herself an alcoholic. *Id.* at 631. Plaintiff also stated that she had recently run out of her medications and that she had not slept for four days. *Id.* at 623.

Plaintiff returned to LCSW Raykin on January 10, 2014, and reported experiencing constant racing thoughts and that she was paranoid that others were laughing at her. Tr. at 617. In February 2014, Plaintiff reported racing thoughts and irresponsible spending. *Id.* at 614. On March 3, 2014, Plaintiff told LCSW Raykim that she was having trouble concentrating, and

difficulty controlling her shopping and sexual activities.  *Id.* at 610.  Plaintiff also stated that she became nervous around others and felt like people were talking about her.  *Id.*  On examination, Plaintiff displayed an irritable affect, digressive thought process, fine mood, fair insight, and mildly impaired judgment.  *Id.* at 615.  Plaintiff was assigned a GAF score of sixty.  *Id.* at 608.  In April 2014, Plaintiff's mental status remained largely unchanged, although LCSW Raykin noted that Plaintiff was dressed flamboyantly.  *Id.* at 605.

On June 4, 2014, Plaintiff stated that she was "doing better" overall, but still reported irritability, inconsistent appetite, and an inability to lose weight despite frequent exercise (walking thirty city blocks per day).  Tr. at 652.  LCSW Raykin noted that Plaintiff was dressed somewhat flamboyantly, but that she presented with a fine mood, logical thought process, fair insight, and only mildly impaired judgment.  *Id.* at 653.  Plaintiff was assigned a GAF score of sixty.  *Id.* at 654.  On June 13, 2014, LCSW Raykin stated that Plaintiff's mood remained fine, but she seemed overwhelmed.  *Id.* at 650.  Approximately two weeks later, LCSW Raykin indicated that Plaintiff's mood was fine, although she displayed an irritable affect and mildly impaired judgment.  *Id.* at 647-48.  Plaintiff was again assigned a GAF score of sixty.  *Id.* at 643.  Two days later, Plaintiff presented in a "hypomanic" state, and reported irritability, constant racing thoughts, and increased spending.  *Id.* at 644.

Plaintiff visited LCSW Raykim on July 28, 2014, and reported that she sent one of her daughters to live with the father due to the daughter not listening and fabricating stories in an effort to have the father call child services.  Tr. at 641.  Continuing, Plaintiff stated that she was planning on returning to Ohio to "get her section eight transfer, [and] take care of child support papers and her driver's license."  *Id.*  Plaintiff was assigned a GAF score of sixty.  *Id.* at 643.  Two days later, Plaintiff reported that her mood was neither elated or depressed, and that she was feeling "kind of overwhelmed" by her search for housing.  *Id.* at 638.  Plaintiff also indicated that her energy had been low for a while and that she was experiencing auditory hallucinations.  *Id.* at 638.  On examination, Plaintiff displayed a "better" mood, full affect, casual appearance, logical goal-directed thought processes, thought content without delusions, and fair insight.  *Id.* at 639.  Plaintiff was again assigned a GAF score of sixty.  *Id.* at 640.  In an opinion dated

October 20, 2014, LCSW Raykin noted that Plaintiff had marked limitations in a number of areas of functioning, and stated, "at the baseline [Plaintiff] is poorly organized, hyperactive, distractible, [and] has interpersonal problems. She is impulsive [and] inconsistent." *Id*. at 658-59.

### B. Testimonial Evidence

On October 23, 2014, the ALJ held a hearing regarding Plaintiff's claims. Tr. at 29. After a brief opening statement, the ALJ examined Plaintiff. *Id.* at 27-28. Plaintiff testified that she had recently started working part-time stocking racks at a retail clothing store. *Id.* at 29-30. At the time of the hearing, Plaintiff had been working at the clothing store for approximately three to four weeks. *Id.* at 30. Plaintiff worked three five-hour shifts per week. *Id.* Next, Plaintiff testified that in 2003 she took a break from working to raise her daughter, but that she had returned to work after 2003. *Id.* at 32. Accordingly, Plaintiff amended her alleged onset date from May 15, 2003, to March 24, 2010. *Id.* at 32-33. When asked what type of work Plaintiff was performing in March 2010, Plaintiff testified that she was performing stand-up comedy, and that her work was sporadic. Tr. at 33.

The ALJ then asked Plaintiff about her average day. Tr. at 35. Plaintiff testified that she typically cleaned and cooked for herself and her daughter. *Id.* at 36. Continuing, Plaintiff stated that she took her daughter to school in the past, but now her daughter took the bus. *Id.* Plaintiff stated that she was not looking for a full-time job because she did not want to overload herself due to her depression. *Id.* Further, Plaintiff testified that she was not performing stand-up comedy at that time because she was homeless, but would be performing if she had an apartment. *Id.*

Plaintiff was then examined by her counsel. Tr. at 37. First, Plaintiff testified that she had not performed stand-up comedy since 2012. *Id.* Plaintiff then stated that she was currently taking Seroquel and that she was not taking any other medications. *Id.* at 38. Continuing, Plaintiff indicated that she was still having issues with depression, but she did not want to take any more medicine because she was putting on weight due to medications prescribed to combat her depression. *Id.* at 39. Plaintiff testified that she was unable to work a full-time job because

her "depression kicks in" when she tried to work a full-time job and raise her kids. *Id.* at 40-41. Plaintiff also indicated that she was also trying to go back to school, and stated, "mentally, I'm not going to do that to myself... I'm going to work what's best for me." *Id.*

Next, Plaintiff testified that she no longer had periods where she did not sleep for days at a time, but still experienced sleeping problems when she became overly anxious. Tr. at 41. Plaintiff testified that she typically slept five to six hours and that she napped during the day when possible, but typically could not nap during the day because she was out of the house. *Id.* at 42. Continuing, Plaintiff stated that her appetite was "okay." *Id.* Plaintiff indicated that she had difficulty concentrating, and when asked about concentrating on the explanation of tasks at her new job, Plaintiff responded that she did "fine" in this regard and that her work "was not rocket science." *Id.*

The ALJ then asked Plaintiff whether she experienced mood swings. Tr. at 43. Plaintiff responded by stating, "well if being irritable is a mood swing, then, yeah." *Id.* Expanding on this topic, Plaintiff stated, "I got, like a temper." *Id.* Next, Plaintiff indicated that she did not have thoughts of hurting herself and that she could not hurt herself because of her children. *Id.* Plaintiff stated that she periodically, rather than regularly, heard voices or sounds that may not be real. *Id.* Continuing, Plaintiff noted that the voices or sounds "happen[ed] mostly outside where I feel like somebody's calling my name." *Id.* Plaintiff denied having visual hallucinations. *Id.*

Next, Plaintiff was again examined by the ALJ. Tr. at 44. The ALJ asked Plaintiff to confirm that she had been working part-time since 2011 through the date of the hearing, which Plaintiff confirmed. Tr. at 45. Additionally, Plaintiff indicated that she had two daughters and that she had been caring for both of her daughters until one went to live with the father. *Id.* at 45-46. Plaintiff stated that she spent an average day working part-time and going to the library with her daughter, and that she helped her daughter with her school work. *Id.* at 46. The ALJ then concluded the hearing. *Id.* at 47.

## III.    RELEVANT PORTIONS OF THE ALJ'S DECISION

After holding the hearing on October 23, 2014, the ALJ issued a decision on November 21, 2014. Tr. at 10. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011, and that Plaintiff had not engaged in substantial gainful activity since March 24, 2010, the amended alleged onset date. *Id.* at 15. Continuing, the ALJ determined that Plaintiff had the severe impairment of bipolar disorder, but that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 15-16.

After consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following limitations: only simple and repetitive tasks; and no work that required more than occasional interaction with the public. Tr. at 16-17. The ALJ determined that Plaintiff had no past relevant work, was a younger individual on the alleged onset date, had a limited education and was able to communicate in English, and that the transferability of job skills was not an issue because Plaintiff had no past relevant work. *Id.* at 19. Considering Plaintiff's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Based on these findings, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, through the date of the decision. *Id.* at 20.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1.     An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.     An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have

found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI. LAW AND ANALYSIS

### A. Medical-Vocational Guidelines

Plaintiff asserts that the ALJ improperly relied on the Medial-Vocational Guidelines, referred to interchangeably herein as the "Grids," to direct a finding of not-disabled without the testimony of a vocational expert ("VE"). ECF Dkt. #14 at 9. First, Plaintiff quotes the portion of the ALJ's decision indicating that Plaintiff's RFC limited her to:

> [A] full range of work at all exertional levels but with the following non-exertional limitations: [s]he can only perform simple and repetitive tasks and she cannot perform work that requires more than occasional interaction with the public.

*Id.* (citing Tr. at 16-17). Plaintiff also notes that the ALJ opined that "[a] finding of not disabled is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines and is consistent with the ruling in SSR 85-15," and that the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that Plaintiff can perform." *Id.* (citing Tr. at 19-20).

Next, Plaintiff contends that the Medical-Vocational Guidelines take into account only exertional limitations, thus it is improper for an ALJ to mechanically apply the Medical-Vocational Guidelines when the ALJ found solely nonexertional limitations. ECF Dkt. #14 at 9. Plaintiff indicates that an ALJ can rely on the Medical-Vocational Guidelines, but only as a framework, and that the Medical-Vocational Guidelines caution that "[t]he rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of limitations." *Id.* at 9-10 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00(e)(1)). Further, Plaintiff claims that her limitations establish a need for testimony from a VE. ECF Dkt.

#14 at 10.  Plaintiff states that she testified that she was unable to work full-time due to overwhelming stress and the ALJ found that she would be unable to do work that requires more than occasional interaction, and therefore the ALJ's rigid application of the Medical-Vocational Guidelines did not allow a VE to help the ALJ understand the impact Plaintiff's severe restriction would have on the occupational base.  *Id*. at 10.

Defendant contends that the ALJ properly relied on the Grids in determining that she was not disabled.  ECF Dkt. #16 at 13.  Specifically, Defendant recognizes that the Grids are often inapplicable where nonexertional impairments exist; however, the Grids may be used where there are nonexertional impairments if "Plaintiff's nonexertional limitations do no 'significantly limit the range of work permitted by her nonexertional limitations.'" *Id.* (citing *Collins v. Comm'r of Soc. Sec.,* 357 Fed.Appx. 663, 670 (6th Cir. 2009) (internal citation omitted)).  Defendant asserts that when relying on the Grids, the ALJ noted that Plaintiff's nonexertional impairments included in the RFC "had little to no effect on the occupational base of unskilled work at all exertional levels," and cited to SSR 85-15 in support of this determination.  *Id.* at 13-14.

Continuing, Defendant indicates that Plaintiff was limited to simple, repetitive tasks, and that this limitation falls within the definition of unskilled work.  ECF Dkt. #16 at 14 (citing *Allison v. Apfel*, 229 F.3d 1150 (6th Cir. 2000); 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200(b)).  Defendant also states that, according to SSR 85-15, unskilled jobs "typically involve dealing primarily with objects, rather than with data or people and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." *Id.* Additionally, Defendant asserts that unskilled work accommodates a need for limited contact with the general public.  *Id.* (citing *Rogers v. Comm'r of Soc.* Sec., No. 09-CV-01972, 2011 WL 445047, at *13 (E.D. Cal. Jan. 25, 2011)).

Plaintiff's arguments are without merit.  The Sixth Circuit has set forth the standard for evaluating whether an ALJ improperly applied the Grids to a claimant who had nonexertional limitations:

A nonexertional impairment is one that affects a claimant's ability to meet the demands of jobs other than the strength demands... [Defendant] may meet [her] burden at step five by referring to the Grids unless the claimant has a nonexertional limitation that significantly limits the range of work permitted by [her] exertional limitations. Before reaching the conclusion that the grid will not be applied because of the alleged nonexertional limitations. Those limitations must be severe enough to restrict a full range of gainful employment at the designated level... Where a claimant has solely nonexertional impairments, unskilled jobs at all levels of exertion make up the potential occupational base. The mental demands of unskilled work are the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting... [SSR 85-15] also describes unskilled jobs at all exertion levels as jobs that ordinarily involve dealing primarily with objects, rather than people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

*Collins*, 357 Fed.Appx. at 670 (internal citations omitted). In *Collins*, the Sixth Circuit ultimately held that there was substantial evidence in the record to support the ALJ's determination that the claimant's mental impairments did not preclude any of the mental demands of unskilled work and that the nonexertional limitations did not "significantly limit the range of work permitted by [the claimant's] exertional limitations, and reliance on the Grids was therefore appropriate." *Id.* at 671 (quoting *Cole v. Sec'y of Health & Hum. Servs.*, 820 F.2d 768, 771 (6th Cir. 1987)).

In the instant case, the ALJ stated:

If [Plaintiff] has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making. [Plaintiff's] ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines and is consistent with the ruling in SSR 85-15.[3]

---

[3]It is worth noting that in *Collins* the ALJ had made the following finding:

If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making. The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines.

Tr. at 20.  The ALJ noted that Plaintiff had two nonexertional limitations, namely that she: (1) can only perform simple and repetitive tasks; and (2) cannot perform work that requires more than occasional interaction with the public.  Tr. at 20.  Plaintiff has solely nonexertional limitations, and thus unskilled jobs at all levels of exertion make up the potential occupational base.  *See Collins*, 357 Fed.Appx. at 670.  As for the first impairment, a limitation to simple, repetitive tasks is within the definition of unskilled work.  *See Allison v. Apfel*, 229 F.3d 1150 (6th Cir. 2000) ("We believe that the ALJ's qualification that [the claimant] was limited to simple, repetitive, and routine tasks, within the category of light work, simply means that [the claimant] is limited to unskilled light work").

Regarding the second impairment, SSR 85-15 indicates that unskilled jobs are:

> [O]rdinarily dealing primarily with objects, rather than with data or people and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

Defendant asserts that this language indicates that unskilled work accommodates Plaintiff's need for work that does not require more than occasional interaction with the public.  ECF Dkt. #16 at 14-15.  In support of this position, Defendant cites a number of cases from outside districts determining that an ALJ properly applied the Grids when the claimant was limited to unskilled work with additional limitations on interaction with the public.[4]  *Id.*  The undersigned agrees that

---

*Collins*, 357 Fed.Appx. at 670.  In *Collins*, the Sixth Circuit found this explanation satisfactory even though the ALJ did not extensively evaluate SSR 85-15.  *Id.*  The language used by the ALJ in the instant case is nearly identical to the language used by the ALJ in *Collins*.  *See* Tr. at 20.

[4]Defendant cites the following cases: *Hurd v. Astrue*, No. 3:10-CV-1116, 2013 WL 140389, at *4-5 (N.D. N.Y. Jan. 11, 2013) (holding that substantial evidence supported the ALJ's finding that the claimant's exertional and nonexertional limitations did not significantly erode his occupational base, and therefore it was appropriate for the ALJ to make a determination of not disabled based on the Grids); *Buschel v. Astrue*, No. 5:10-cv-1535, 2012 WL 463443, at *5 (N.D. N.Y. Feb. 13, 2012) (holding that the ALJ's decision to forego consultation with a VE and rely on the Grids was proper as the claimant's nonexertional limitations did not significantly limit the range of work permitted by his exertional limitations); *Boley v. Astrue*, No. 11-10896, 2012 WL 680393, at *11 (E.D. Mich. Feb 10, 2012), *adopted by* 2012 WL 680392 (E.D. Mich. Mar. 1, 2012) (the claimant's limitation to brief and superficial contact with the public did not preclude the ALJ from relying on the Grids) (collecting cases); *Adkins v. Astrue*, No. 3:10CV60, 2011 WL 652508, at *4 (E.D. Va. Feb. 10, 2011) (affirming the ALJ's finding that Plaintiff was capable of performing work that existed in significant numbers in the national economy based on the conclusion that Plaintiff's limitation to positions that did not require contact with the general public had little effect on the occupational base); *Rogers v.*

-15-

Plaintiff's limitation to work that did not require more than occasional interaction with the public did not erode her occupational base. Plaintiff was limited to work that constituted the completion of simple and repetitive tasks, *i.e.*, unskilled work, and SSR 85-15 states that unskilled work deals primarily with objects, rather than interaction with others. The Sixth Circuit has made clear that unskilled jobs at all levels of exertion make up the potential occupational base for a claimant with solely nonexertional impairments. *See Collins*, 357 Fed.Appx. at 670. Therefore, the limitation requiring only occasional interaction with the public did not erode Plaintiff's occupational base of unskilled jobs at all levels of exertion. Accordingly, the ALJ did not err when applying the Grids.

The cases cited by Plaintiff are unconvincing. Plaintiff cites *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990), for the proposition that "a final determination of not disabled may only be entered if supported by expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics." ECF Dkt. #14 at 9-10. However, in *Abbott*, the ALJ did consult a VE, but failed to make the VE aware of the claimant's severe mental impairments. 905 F.2d at 926. The Sixth Circuit found that "[u]nder such circumstances, [the VE's] testimony cannot satisfy the Secretary's burden of proof at the final stage of the disability determination." *Id.* The instant case does not involve a situation in which the VE was not aware of all of the claimant's impairments. Moreover, in *Abbott* the Sixth Circuit noted that there was no evidence that the claimant was capable of performing substantial gainful activity existing in the national economy. In the instant case, there is evidence that Plaintiff was capable of performing substantial gainful activity existing in the national economy insofar as she was working part-time at the time of the hearing while raising her daughter, reported self-employment earnings for stand-up comedy shows for at least

---

*Comm'r of Soc. Sec.*, No. 09-CV-01972, 2011 WL 445047, at *13 (E.D. Cal. Jan. 25, 2011), *aff'd* 490 Fed.Appx. 15 (6th Cir. 2012) (indicating that unskilled work accommodates a need for limited contact with the general public).

two years after her alleged onset date, and indicated that she would have still been performing at the time of the hearing if she had an apartment.[5]  *See* Tr. at 29-30, 36-37, 45.

Plaintiff also cites *Payne v. Comm'r of Soc. Sec.,* No. 1:12CV2637, 2013 WL 5820119, at *10 (N.D. Ohio Oct. 29, 2013), in support of her contention that "sole reliance on the [G]rids to make a determination of not disabled is inappropriate where a plaintiff's RFC is limited by nonexertional impairments."  ECF Dkt. #14 at 10.  In addition to the explanation provided by the Sixth Circuit in *Collins*, as discussed above, *Payne* presented a factually distinct set of circumstances in which the claimant experienced exertional and nonexertional limitations.  In *Payne*, the Court specifically stated:

> Here, [the claimant's] RFC included nonexertional limitations related to stooping, handling, and concentrated exposure to hazards.  Despite these nonexertional limitations, the ALJ did not take VE testimony, and instead relied solely on [G]rids and a citation to SSR 85-15.  However, neither the [G]rids (which consider only exertional limitations), nor SSR 85-15 (which considers only nonexertional limitations) apply to Plaintiff, who suffers from both exertional and nonexertional limitations.

2013 WL 5820119, at *11.  In the instant case, Plaintiff suffers only from nonexertional limitations, and the ALJ handled the application of the Grids in a manner that was in compliance with the requirements set forth by the Sixth Circuit.  For these reasons, the undersigned recommends that the Court find that the ALJ properly relied on the Grids when determining that Plaintiff was not disabled.

## B.    RFC Finding

Next, Plaintiff asserts that the ALJ erred because he accorded significant weight to Dr. Finnerty, a state agency reviewing psychologist, but did not incorporate all of the limitations

---

[5]This evidence is based on Plaintiff's testimony.  The undersigned recognizes that there are inconsistencies in Plaintiff's testimony regarding her limitations and the record, such as: her consistent GAF scores of sixty; her problems being largely related to financial stressors and social services; positive responses to psychiatric medication; a part-time job that she stated was not difficult for her to perform; unwillingness to perform full-time work so that she could care for her daughter; and the statement that she had performed a comedy show in Michigan as recently as late 2013 or early 2014, well after the alleged onset date.  *See* Tr. at 19, 614.

opined by Dr. Finnerty in the RFC finding.[6]  ECF Dkt. #14 at 11-13.  Specifically, Plaintiff states that Dr. Finnerty concluded that she could sustain simple tasks without fast pace, and that the ALJ's RFC finding did not include this limitation nor account for the omission.  *Id.* at 11. Plaintiff contends that this constitutes reversable error under *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010), as the ALJ did not include Dr. Finnerty's speed- and pace-based restrictions in the RFC finding.  *Id.*

Defendant contends that Plaintiff misconstrues that notion of an RFC finding, and that in formulating the RFC finding, the ALJ is required to consider not only medical source statements, but also other evidence such as reports of daily activities and attempts to work.  ECF Dkt. #16 at 16 (citing *White v. Comm'r of Soc. Sec.*, 970 F.Supp.2d 733, 742 (N.D. Ohio Sept. 10, 2013); SSR 96-8p).  Further, Defendant avers that the ALJ bears the ultimate responsibility for assessing a claimant's RFC, based on all of the related evidence, not just medical evidence.  *Id.* According to Defendant, even though the ALJ accorded significant weight to Dr. Finnerty's opinion, he was not required to adopt every conclusion in that opinion.  Defendant states, "[s]imply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts, or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight."  *Id.* (quoting *Smith v. Comm'r of Soc. Sec.*, No. 5:11CV2104, 2013 WL 1150133, at *11 (N.D. Ohio Mar. 19, 2013), *aff'd* (Jan. 30, 2014)).

Continuing, Defendant asserts that the ALJ formulated Plaintiff's RFC after consideration of the entire record.  ECF Dkt. #16 at 17.  Defendant notes that the ALJ discussed Plaintiff's testimony that she worked part-time from the 2011 through the date of the hearing, including performing sporadic comedy shows until 2012, and that she worked for fifteen hours per week in 2014 and did not find the job challenging.  *Id.*  Additionally, Defendant states that the ALJ considered Plaintiff's treatment notes indicating that she performed a comedy show in Michigan in 2014, and testimony that she cooked, cleaned, visited her daughter's school

---

[6]Both parties refer to Dr. Finnerty as the state agency reviewing physician. ECF Dkt. #14 at 11; ECF Dkt. #16 at 16.  However, as Dr. Finnerty holds a Psy.D., he is more properly referred to as a psychologist, rather than a physician.

occasionally, and spent her free time looking for an apartment. *Id.* Additionally, Defendant highlighted that the ALJ noted that Plaintiff was consistently assessed with a GAF score of sixty, which indicated moderate-to-borderline mental health symptoms at the worst. *Id.* at 17-18 (internal citations omitted).

Defendant's arguments are well taken. When formulating the RFC finding, the ALJ was under no obligation to adopt Dr. Finnerty's opinion it entirety even though significant weight was accorded to the opinion. *Smith*, 2013 WL 1150133, at *11. "While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner." *Id.* (internal citation omitted). After discussing the medical evidence presented in this case, the ALJ determined that Plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, however, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. Tr. at 16-18. The ALJ then cited the reasons for his credibility determination, namely that Plaintiff: was consistently assessed as having a GAF score of sixty, and that many of her problems were related to financial stressors and difficulties related to social services; had a good response to psychiatric medication; and worked a simple job as a clothing stock clerk, and acknowledged the job was not challenging and that she was not willing to perform this type of work full-time because of the competing need of caring for her daughter. *Id.* at 19. Additionally, the ALJ stated that the overall evidence showed no worse than moderate symptoms, which were accounted for in the RFC finding. *Id.*

After discussing Plaintiff's credibility, the ALJ indicated that he accorded great weight to Dr. Finnerty's opinion and the limitations reported therein were considered when making the RFC finding. Tr. at 19. Finally, the ALJ stated:

> In sum, the above [RFC] assessment is supported by the treating source records and repeated GAF scores, the findings and opinions of consultative and reviewing sources in the record, [Plaintiff's] apparent good response to medications, and [Plaintiff's] testimony regarding her activities and abilities, especially her current part-time work and ability to care for her daughter as well as reports in the records indicating that she has been looking for employment.

*Id.* "[T]he ALJ bears the ultimate responsibility for assessing a claimant's RFC, based on all of the relevant evidence." *White,* 970 F.Supp.2d at 742. The ALJ was under no obligation to adopt Dr. Finnerty's opinion in its entirety, and, based on all of the relevant evidence, chose not to incorporate that portion of the opinion relating to pace in the RFC finding. This was not err.[7]

Finally, Plaintiff's reliance on *Ealy* is misplaced. *See* ECF Dkt. #14 at 11-12. In *Ealy*, the ALJ relied on a VE's testimony in response to a hypothetical question that stated, in relevant part, "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." *Ealy*, 594 F.3d at 516. The ALJ's hypothetical question omitted speed- and pace-based restrictions imposed by both the ALJ and the state agency psychological consultant. *Id.* Accordingly, the Sixth Circuit held that the claimant's limitations were not fully conveyed to the VE, and remanded the case because the controlling hypothetical inadequately described the claimant's limitations. *Id.* at 517.

In *Ealy*, the ALJ agreed with the state agency psychological consultant regarding the claimant's limitations, but then inadequately described those limitations to the VE. This constituted reversible error because the ALJ found the claimant to have speed- and pace-based limitations, but then completely omitted these restrictions from the hypothetical question posed to the VE. In the instant case, the ALJ simply did not incorporate the entirety of Dr. Finnerty's opinion in his RFC finding because the totality of the evidence did not support the entirety of the opinion. Unlike *Ealy*, this is not a case in which the ALJ omitted portions of the RFC finding relating to the claimant's limitations when reconciling that RFC finding with jobs that are available in significant numbers in the national economy. Instead, for the reasons stated above, the ALJ properly chose to omit portions of the opinion of a state agency reviewing psychologist that were not supported by the totality of the evidence. For these reasons, the undersigned recommends that the Court find that the ALJ properly formulated Plaintiff's RFC.

---

[7]Plaintiff briefly addresses three additional limitations imposed by Dr. Finnerty that were not adopted by the ALJ. *See* ECF Dkt. #14 at 12. It was not err for the ALJ to exclude these limitations from the RFC finding for the same reason the ALJ did not err by excluding the limitation regarding pace.

## VII.	CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the

ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: April 28, 2017	_____/s/George J. Limbert_____
	GEORGE J. LIMBERT
	UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).